UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
MARIA DEL CARMEN LAGUERRE,       :      13 Civ. 6747 (JCF)
                                 :
          Plaintiff,             :         MEMORANDUM
                                 :         AND   ORDER
     - against -                 :
                                 :
COMMISSIONER OF SOCIAL SECURITY, :
                                 :
          Defendant.             :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

          Pursuant to section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), Maria Del Carmen Laguerre, proceeding

pro se, appeals a decision by the Acting Commissioner of Social

Security (the "Commissioner") denying her application for

Supplemental Security Income Benefits ("SSI").   The Commissioner

has filed a motion for judgment on the pleadings, which the

plaintiff did not oppose.   The motion is granted.

Background

     A.   Personal History

     Ms. Laguerre was born on July 16, 1976, and filed her

application for SSI in September 2011, when she was 35 years old.

(R. at 91).[1]   The protective filing date of her application is

September 13, 2011.[2]   (R. at 131).   She attended college for two

years and has worked as a cashier, tutor, and web developer/project

manager.   (R. at 107).   She stopped working on May 1, 2011, due to

_____

     [1] "R." refers to the Administrative Record filed with the
court.

     [2] Pursuant to 20 C.F.R. § 416.501, SSI benefits cannot be paid
for any period prior to the date of the application.

her medical conditions, which included back problems, migraines, asthma, leg pain, and depression. (R. at 106). Her main reason for leaving her most recent job was depression. (R. at 111).

At the time of filing, Ms. Laguerre lived in an apartment with her family and took care of her three daughters with some help from her mother and sisters. (R. at 136-37). She reported that her conditions impeded her ability to walk, stand, and sit for extended periods of time; to climb stairs, kneel, squat, and reach without pain; and to concentrate, making it difficult to complete tasks. (R. at 137; 141-42).

    B.   <u>Medical History</u>

       1.   <u>January 5, 2008 to September 12, 2011</u>

On January 5, 2008, Ms. Laguerre was admitted to Metropolitan Hospital Center with migraines and abdominal pain that had lasted three weeks. (R. at 182-88). She was discharged on January 7, 2008. (R. at 182). She visited the neurology clinic on January 22, 2008, reporting that her migraines, which began after she suffered head trauma in 2002 and had since worsened, were mildly relieved by Topamax. (R. at 213-14). The physician prescribed an increased dosage of Topamax, continued her on Maxalt, and encouraged her to lose weight and avoid coffee and soda. (R. at 214).

The plaintiff followed-up with Judit Osvath, M.D., on February 24, 2008. (R. at 208-09). She reported that she suffered headaches every two days. (R. at 209). Ms. Laguerre had not taken Topamax for many months and reported that she suffered side-effects

from the medication. (R. at 209-10). Dr. Osvath referred her for a neurology exam and for possible weight reduction surgery, noting that Ms. Laguerre weighed 315 pounds, menstruated irregularly, and had worsening hirsutism. (R. at 209-10). The plaintiff's mild persistent asthma was controlled with medication. (R. at 210).

Ambra Ferraris, M.D., evaluated Ms. Laguerre at the pulmonary clinic on June 30, 2010, prior to bariatric surgery. (R. at 204-05). She assessed the plaintiff with moderate persistent asthma/mild restrictive lung disease, morbid obesity, instability in the temporomandibular joint, possible reflux disease or gastritis, possible sleep apnea, and recurrent tonsilitis. (R. at 206-07). Dr. Ferraris continued Ms. Laguerre's asthma treatment and referred her to a maxillofacial specialist, a rhino-otolaryngologist, and a sleep study. (R. at 206-07).

Ms. Laguerre's pre-operative cardiology examination occurred on August 25, 2010. (R. at 194). She was diagnosed with shortness of breath (known as dyspnea) and cleared for surgery. (R. at 201-02). On the same date, the pulmonary clinic found "[c]hronic obstructive asthma, with (acute) exacerbation," but "no absolute pulmonary contraindications for [bariatric] surgery." (R. at 196). The plaintiff was continued on her asthma medication and prescribed deep vein thrombosis prophylaxis, as well as nasal CPAP (continuous positive airway pressure) during sleep. (R. at 196). A chest x-ray in October 2010 showed no signs of acute cardiopulmonary disease. (R. at 215).

In a visit to the neurology clinic on January 3, 2011, Ms.

Laguerre reported that she had last visited the clinic in September 2010 and restarted Topamax and Maxalt for her migraines.  (R. at 190).  Her bariatric surgery had been performed in October 2010.  (R. at 190).  Although she reported a severe headache episode the previous month, her current complaint was "daily headaches of mild to moderate intensity," which she treated with Topamax and Maxalt supplemented with Motrin.  (R. at 190-91).  The physician increased her Topamax dosage, continued her on Maxalt, discontinued Motrin, and asked her to return for a follow-up in three months.  (R. at 191).

2.   September 13, 2011 to July 11, 2012

Ms. Laguerre returned to the neurology clinic for a follow-up on September 19, 2011.  (R. at 241).  The plaintiff reported that she had run out of her medication "months ago" and was taking up to six over-the-counter migraine pain relievers a day.  (R. at 242).  Upon examination, Anne Kleiman, M.D., found that the plaintiff had lost a significant amount of weight and weighed 267 pounds.  (R. at 242).  Her cranial nerves and tone were normal, she was mentally intact, and her gait was steady.  (R. at 242).  Dr. Kleiman diagnosed "[c]ommon migraine without mention of intractable migraine," prescribed an increased dosage of Topamax (to 100 mg), directed the plaintiff to take Maxalt as needed and discontinue the over-the-counter medication, and to return in six weeks with a headache calendar.  (R. at 242).

Approximately three weeks later, the plaintiff underwent a laproscopic procedure to remove her gallbladder as treatment for

4

gallstones and pancreatitis. (R. at 220-23). She returned to the neurology clinic on November 7, 2011, complaining of ongoing migraines. (R. at 247). Her headache calendar showed frequent mild headaches and severe migraines approximately once per week. (R. at 248). Ms. Laguerre stated that she had stopped working because of her recent medical problems. (R. at 248). Dr. Kleiman continued the Topamax and Maxalt prescriptions and asked the plaintiff to maintain her headache calendar and return in three months. (R. at 248).

On November 9, 2011, Ms. Laguerre returned to Dr. Osvath for a medical evaluation and to monitor her treatment plan. (R. at 244). The plaintiff complained of migraines and lower back pain and stated that she had been depressed since she was a teenager, but had not sought treatment for the condition. (R. at 244). Her weight was recorded at 162 pounds.[3] (R. at 244). Examination of her head, eyes, ear, nose and throat was normal except for mild tearing. (R. at 244). All other areas, including chest, cardiovascular system, extremities, neurology, motor function, and sensory system were normal, with the exception of a small scar on her abdomen. (R. at 244). Dr. Osvath assessed migraine; lower back pain, to be treated with Motrin and to be evaluated for rehabilitation; mild persistent asthma and allergic rhinitis, to be treated with Flovent, albuterol, and Flonase; morbid obesity post

---

[3] This is evidently a recording error, as Ms. Laguerre's weight seven weeks prior to this visit was 267 pounds (R. at 242) and her weight less than one week after this visit was 260 pounds (R. at 257).

bariatric surgery, and depression. (R. at 245). Dr. Osvath noted that the plaintiff had an asthma clinic evaluation in one week and a psychiatric evaluation the next day. (R. at 245).

As planned, Ms. Laguerre visited the behavioral health clinic on November 10, 2011, complaining of feelings of depression and anxiety. (R. at 286). She noted difficulty concentrating, insomnia, and low energy for the prior eight months, which coincided with her lack of employment. (R. at 286). Ms. Laguerre reported her recent surgery and worsening migraines, as well as a number of familial issues: her 18 year-old learning disabled daughter had left home to move in with her boyfriend, which the plaintiff's mother blamed on the plaintiff; and her 13 year-old daughter, who had a learning disability and ADHD, was very needy, seriously depressed, and had required psychiatric treatment. (R. at 286-87). Ned Marcus, M.D., assessed a single, moderate episode of major depressive disorder, headache, and problems with her primary support group related to social environment. (R. at 287). Dr. Marcus prescribed Prozac, admitted her to the Adult Mental Health Clinic (which was to contact her to set up an appointment), and planned to re-assess her in 30 days. (R. at 287).

On November 15, 2011, Vinod Thukral, M.D. performed a consultative internal medicine examination. (R. at 255). He noted that Ms. Laguerre reported a history of asthma, a heart murmur which had resolved itself, reflux esophagitis, and a number of prior surgeries: the 2010 bariatric surgery (which resulted in a 100-pound weight loss) and 2011 gallbladder surgery, as well as an

umbilical hernia repair and excision of an ectopic pregnancy, both in 1998.  (R. at 255-56).  She also reported a lower back sprain -- which x-rays confirmed was not a fracture or a dislocation -- caused by the prior motor vehicle accident.  (R. at 255).  She evaluated the pain as eight on a 10-point scale, "sharp and intermittent, with radiation of the pain to the right lower extremity along with numbness."  (R. at 255).  Standing for long periods, bending, pulling, pushing, and lifting increased the pain. (R. at 255).  She further asserted that after an MRI she was diagnosed with two disk herniation, to be conservatively treated, and that her last orthopedic follow-up was one year prior.  (R. at 255).  Ms. Laguerre stated that she had been treated for depression for the past year and for insomnia for the past three.  (R. at 255).  Her migraines, from which she had suffered for the past five years, occurred daily and lasted for the entire day.  (R. at 256). She estimated the pain at seven on a 10-point scale, sharp and continuous, but without any nausea, vomiting, dizziness, or other related symptoms.  (R. at 256).  Dr. Thukral noted that she was obese (her weight was 260 pounds) but not in any acute distress. (R. at 257).  Her gait was normal and she was able to walk on heels and toes, squat, change clothes for the exam, get on and off the exam table, and rise from a chair without assistance or difficulty. (R. at 257).  Skin and lymph nodes, head and face, eyes, ears, nose, throat, neck, chest and lungs, heart, spine, neurology, extremities, and fine motor activity were normal, as was the abdomen except for the healed scar.  (R. at 257-58).  She was

dressed appropriately, maintained good eye contact, appeared oriented and had normal affect. (R. at 258). There was no evidence of impaired judgment or memory, and she denied suicidal thoughts. (R. at 258). Ms. Laguerre asserted that she lived with her three daughters, cooked five times a week, cleaned three times a week, did laundry once a week, and shopped once a month. (R. at 257). She showered, bathed, dressed, and cared for children on a daily basis. (R. at 257). For leisure, she watched television and read. (R. at 257).

Dr. Thukral diagnosed all of the following "by history": asthma, lower backache, heart murmur, treated depression, insomnia, migraine headache, obesity (status post bariatric sleeves surgery), and reflux esophagitis. (R. at 259). He opined that the plaintiff had no limitations for sitting, standing, bending, pulling, pushing, lifting, carrying, or related activities, but that she should avoid smoke, dust, and other respiratory irritants. (R. at 259).

Yesenia Santana-Rosado, M.D., evaluated Ms. Laguerre at the behavioral health clinic on November 17, 2011. (R. at 282). The plaintiff, who reported that she was unemployed and financially supported by her ex-husband and public assistance, complained that she had felt depressed since she was eight years old, and that the depression had intensified in the last two years and further worsened in the last two months. (R. at 282-83). Ms. Laguerre described feeling worthless, hopeless, lonely, and unmotivated, and having trouble sleeping and concentrating. (R. at 283). She

8

discussed her relationship with her mother, whom she described as controlling, judgmental, and domineering. (R. at 282-83). Her mother's reported comment that the plaintiff was a failure as a mother because her 18 year-old daughter had left home had exacerbated the plaintiff's depression. (R. at 283). Dr. Santana-Rosado assessed that Ms. Laguerre looked older than her age, was cooperative and alert, had normal psychomotor activity, normal rate and rhythm of speech, and non-psychotic thought content. (R. at 282). Her affect was flat and her mood depressed, but she denied hallucinations and had no ideas, intents, or plans to harm herself or others, and she reported good impulse control. (R. at 282-84). Dr. Santana-Rosado diagnosed a single moderate episode of major depressive disorder and continued her Prozac prescription. (R. at 284). She also reviewed sleep hygiene techniques with the plaintiff and advised her to return in one week with a schedule of her daily activities. (R. at 283).

Dr. Santana-Rosado saw the plaintiff again on November 22, 2011, for a follow-up visit. (R. at 278). Her evaluation was similar to that of the previous week. (R. at 278-79). Ms. Laguerre was anxious about living up to family and home-making obligations for the approaching holidays. (R. at 279). She reported that she had done her homework but erased it because she did not like how it looked. (R. at 279). She also had begun erasing pictures from social media, which made her feel relieved. (R. at 279). She had been able to talk to her oldest daughter and to her ex-husband without feeling guilty and was working on

improving her relationship with her mother. (R. at 279). Dr. Santana-Rosado reviewed and reinforced sleep hygiene techniques with the plaintiff and asked her to make a list of the number of times her mother made positive and negative comments about her. (R. at 279).

The plaintiff returned to the pulmonary clinic on December 6, 2011, and saw Ivette Alfonso, M.D. (R. at 295). She reported that her most recent asthma attack was four weeks ago and that her condition had improved with medication. (R. at 295). When she walked three to four blocks, her chest began to feel tight. (R. at 295). Ms. Laguerre further complained of snoring and awakening at night with a choking sensation, but noted that she had been tested and told that she did not need CPAP at night. (R. at 295). Her reflux symptoms had worsened. (R. at 295). Dr. Alfonso switched one of her asthma medications but continued the others, referred her to a sleep study in light of her weight loss, and continued her on Nexium for her reflux symptoms, also referring her to her bariatric surgeon for follow-up. (R. at 296).

One week later, Angela Fairweather, Ph.D., performed a consultative psychiatric evaluation. (R. at 260, 263). Ms. Laguerre reported difficulty falling asleep, depressed mood, loss of energy and interest, social withdrawal, panic attacks, agoraphobia, paranoid ideation, and some long-term memory deficit, as well as sleep apnea, asthma, back pain, pancreatitis, and migraines. (R. at 260). She noted that she lived with her three children and was able to dress, bathe and groom herself, cook food,

10

do light cleaning, manage money, and, if accompanied, shop; however, anxiety prevented her from taking public transportation. (R. at 262). She spent most of her days watching television. (R. at 262). Dr. Fairweather's examination showed that the plaintiff's appearance was consistent with her age; she was dressed appropriately and had fair hygiene and grooming. (R. at 261). Her gait, posture, and motor behavior was normal and her eye contact was appropriate. (R. at 261). Ms. Laguerre's speech was fluent and clear, with adequate expressive and receptive languages. (R. at 261). She had intact attention and concentration and good insight. (R. at 261-62). However, her affect was depressed and her mood dysthymic;[4] her recent and remote memory skills were impaired due to psychiatric symptoms; her intellectual functioning was below average; and anxiety impaired her perception at times. (R. at 261-62). Dr. Fairweather diagnosed severe major depressive disorder with psychotic features, and panic disorder with agoraphobia. (R. at 262). She noted that Ms. Laguerre could follow and understand simple directions, perform simple tasks independently, and learn new tasks. (R. at 262). She showed mild difficulty maintaining attention and concentration, making appropriate decisions, and relating adequately with others; mild to moderate difficulty performing complex tasks independently; moderate difficulty maintaining a regular schedule; and moderate to

---

[4] Dysthymia is mild or moderate depression that lasts for at least two years. FamilyDoctor.org, Dysthymic Disorder, Overview, available at http://familydoctor.org/familydoctor/en/diseases-conditions/dysthymic-disorder.html (last visited Dec. 10, 2014).

significant difficulty dealing with stress appropriately.  (R. at
262).  Dr. Fairweather believed these difficulties to be caused by
psychiatric symptoms.  (R. at 262).  The plaintiff's prognosis was
fair with continued treatment.  (R. at 263).

Having missed her two prior appointments, Ms. Laguerre saw Dr.
Santana-Rosado on December 21, 2011.  (R. at 274-75).  The
plaintiff reported feeling unwell, in particular since she learned
that her mother might have uterine cancer.  (R. at 275).  She had
been having significant problems with her daughters, including
frequent arguments and difficulty communicating.  (R. at 275).
According to Ms. Laguerre, on the previous day she was so angry
that she thought about hurting one of her daughters and heard a
voice commanding her to do so; however, she took a walk to get away
from the situation.  (R. at 275).  In addition, she thought about
hurting herself but stated that she would not and instead would
call her sister for help.  (R. at 275).  She further reported
trouble sleeping and panic attacks.  (R. at 275).  Dr. Santana-
Rosado transferred her to the psychiatric emergency room for
evaluation.  (R. at 275).

When she returned to Dr. Santana-Rosado the next day, Ms.
Laguerre reported feeling calmer and less depressed, and denied
hallucinations and thoughts of hurting herself or others.  (R. at
270-71).  She asserted that she would not "do 'something stupid'
because she really cares for herself and her daughter."  (R. at
271).  According to the plaintiff, when she returned from the
psychiatric emergency room, she had a family meeting to explain the

12

reasons she was sent there; her sister consequently promised to spend the upcoming holidays with her for support. (R. at 271). Ms. Laguerre committed to attending her therapy appointments and doing her homework, which included writing her feelings before and after every panic attack and making a list of the top three things she wanted to address in therapy. (R. at 271). In addition, Dr. Santana-Rosado reviewed breathing techniques to help address the panic attacks. (R. at 271).

Ms. Laguerre visited the pulmonary clinic on January 3, 2012, complaining of worsening chest tightness and a barking cough, neither of which improved with her normal medications, although the prednisone that she had taken for the past two days helped somewhat. (R. at 290). She was continued on prednisone for another three days, continued on albuterol (for which a nebulizer was prescribed), Singulair, and Flonase, and her Advair was increased. (R. at 291).

On January 30, 2012, state agency consulting psychologist T. Harding assessed the plaintiff's records. (R. at 303-20). He found she suffered from major depression (R. at 306) and assessed moderate restriction of daily living activities, and moderate difficulty in maintaining social functioning and concentration, persistence, or pace (R. at 313). He further found that she had never experienced episodes of deterioration of extended duration. (R. at 313). In assessing her mental residual functional capacity, he found that the following abilities were moderately limited: understanding, remembering, and carrying out detailed instructions;

maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining an ordinary routine without special supervision; interacting appropriately with the general public; accepting instructions and responding appropriately to supervisor criticism; getting along with coworkers or peers; maintaining socially appropriate behavior and basic standards of neatness and cleanliness; and responding appropriately to changes in the work setting. (R. at 317-18). In sum, he found she was capable of performing unskilled entry level tasks. (R. at 319).

In February 2012, Dr. Kleiman stated in a letter that Ms. Laguerre had poorly controlled migraines which affected her ability to function, and that she would continue to receive treatment at the clinic. (R. at 321). Dr. Santana-Rosado stated in an undated letter that the plaintiff had major depressive disorder and was in treatment, including medication and weekly psychotherapy. (R. at 322).

In a form assessment dated February 27, 2012, Dr. Santana-Rosado stated that for ten months Ms. Laguerre had experienced depression, anxiety, hopelessness, helplessness, and insomnia caused by stress from medical problems. (R. at 323, 328). Her diagnosis was major depressive disorder. (R. at 323). Dr. Santana-Rosado reported that the plaintiff took Prozac and Atorax and attended cognitive behavioral therapy weekly. (R. at 325). She noted that, although disheveled, the plaintiff was cooperative and behaved appropriately; her speech, thought, perception,

concentration, information, and ability to perform calculations were within normal limits; her mood was depressed and anxious and her affect was constricted; and she had good insight and judgment. (R. at 326). She assessed that the plaintiff had no limitations in any of the mental functioning categories (understanding and memory, sustained concentration and persistence, social interaction, and adaption). (R. at 327). She offered no opinion on Ms. Laguerre's ability to perform work-related activities. (R. at 328).

In a June 4, 2012 letter, Dr. Santana-Rosado reported that Ms. Laguerre had been under her care for the past eight months and was being treated for major depressive disorder due to a general medical condition, and listing the plaintiff's medications as Prozac, Wellbutrin, Atarax, and Ambien. (R. at 329).

### 3.   Evidence Submitted to the Appeals Council

The plaintiff presented additional records when she sought review by the Appeals Council of the Social Security Administration after her application for benefits had been denied by the Administrative Law Judge ("ALJ"). These included a list of prescriptions filled between the beginning of January 2012 and the middle of February 2013. (R. at 168-80). Discharge paperwork from July 17, 2012, indicates that Ms. Laguerre was examined at a hospital in Florida and discharged with a prescription for pain medication after a physical assault resulting in a head injury. (R. at 331-35). In a letter dated September 11, 2012, Dr. Santana-Rosado stated that Ms. Laguerre has been her patient since November 2011 for treatment of major depressive disorder due to a general

medical condition and listed her medical problems (status post
bariatric surgery, hiatal hernia, anemia of B12 deficiency, asthma,
morbid obesity, and migraine) and her psychotropic medications
(Prozac, Atarax, and Ambien). (R. at 339). A November 7, 2012
treatment note from Ned Marcus, M.D., at the behavioral health
clinic stated that Ms. Laguerre had difficulty maintaining
attention span (by history), showed signs of underlying psychosis,
and had evident symptoms of anxiety, including visibly trembling
when discussing emotional subjects. (R. at 340). He diagnosed a
recurrent episode of major depressive disorder without mention of
psychotic behavior. (R. at 341). He opined that she was
"vocationally incapacitated for at least the coming four months."
(R. at 341).

    C.   <u>Procedural History</u>

    As noted, Ms. Laguerre's protective filing date is September
13, 2011. Her application for benefits was denied on February 1,
2012. (R. at 60-65). A hearing before ALJ Mark Solomon was held
on June 5, 2012. (R. at 21).

    Ms. Laguerre, who appeared at the hearing <u>pro se</u>, reported
prior work as a web designer, a cashier, and a secretary. (R. at
29-31). She testified that her most recent employment, as a tutor,
ended in April 2010 after she had a "few episodes" during which she
was unable to concentrate and "spac[ed] out." (R. at 28, 31). At
the time of the hearing, she lived with her 13-year old and her 10-
year old daughters. (R. at 32-33). She was physically able to
take the bus; walk up to three blocks without assistance; dress,

16

bathe, feed, and clothe herself; cook for her children; do household chores; and shop once a month. (R. at 33-35, 38). However, about three times a week she was unable to get out of bed, either because of her psychological condition or because of side-effects from medication. (R. at 34). On those days, she used Facebook to contact family. (R. at 35). Ms. Laguerre further reported that, because of back pain (for which she had been in physical therapy for two years), she could not sit for more than 30 minutes, and standing for long periods also presented problems. (R. at 36, 38). She suffered from migraines with nausea, vomiting, light-sensitivity, and dizziness, every two weeks. (R. at 38-39). Ms. Laguerre testified that her inability to concentrate made her unable to work because she likes to "be giving everything that [she] could provide to people when [she is] working. And lately, [she is] not able to do that." (R. at 37).

Vocational expert Helene Feldman also testified at the hearing. (R. at 40). She identified Ms. Laguerre's past relevant work as a tutor (skilled work with light exertion) (R. at 40-41), a web designer (which she analogized to systems programming and classified as sedentary) (R. at 42), a cashier (light exertion) (R. at 43), and a secretary (sedentary) (R. at 44). The ALJ posed a question that limited a hypothetical claimant to light work with the ability to sit, stand, or walk for six hours each and lift 20 pounds occasionally and 10 pounds frequently; prohibited concentrated exposure to respiratory irritants, hazardous materials, and unprotected heights; required remembering and

17

carrying out simple instructions, making simple decisions, maintaining attention and concentration for two hours at a time, and following a regular schedule; allowed occasional close interpersonal contact; and restricted supervisory duties and stress. (R. at 44). Ms. Feldman found that this hypothetical claimant could not perform Ms. Laguerre's past relevant work. (R. at 44-45). However, a hypothetical claimant with those limitations, as well as Ms. Laguerre's age, education, and work experience could work as an administrative clerk, a mailroom clerk, an office helper, or a small parts assembler. (R. at 45-47). When taking into account the added condition that the hypothetical claimant could only sit for 30 minutes at a time, however, Ms. Feldman testified that there were no jobs the plaintiff could perform. (R. at 48).

On July 11, 2012, ALJ Solomon issued a decision finding that Ms. Laguerre was not disabled. (R. at 17). The Appeals Council denied the request for review on August 14, 2013. (R. at 1).

Discussion

     A.   Analytical Framework

          1.   Determination of Disability

A claimant is considered disabled under the Act, and therefore entitled to disability benefits, if she can demonstrate through medical evidence that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

18

of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); <u>see</u>
<u>also</u> <u>Marrero v. Apfel</u>, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000).

The disability must be of "such severity that [the claimant]
is not only unable to do [her] previous work but cannot,
considering [her] age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy." 42 U.S.C. § 423(d)(2)(A).

To determine if a claimant is disabled for Social Security
Disability purposes, the Commissioner follows a five-step process.
20 C.F.R. § 1520(a). To begin with, the claimant must establish
that she is not currently engaged in a substantial gainful
activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is
not so engaged, then the Commissioner determines whether the
claimant has an impairment severe enough to significantly limit her
physical or mental ability to do basic work activities. 20 C.F.R.
§ 404.1520(a)(4)(ii), (c). If the impairment meets or equals one of
the disabilities listed in Appendix 1 of the regulations, the
claimant is automatically found to be disabled and eligible for
benefits. 20 C.F.R. § 404.1520(a)(4)(iii), (d). On the other
hand, if the claimant's impairment is not among those listed in the
regulations, the claimant must show that she does not have the
residual functional capacity to return to her former employment.
20 C.F.R. § 404.1520(a)(4)(iv), (f). Finally, if the claimant
establishes that she is incapable of returning to her prior work,
the burden of proof shifts to the Commissioner to show that there
is other work available in the economy that the claimant would be

able to perform.  20 C.F.R. § 404.1520(a)(4)(v), (g), (h); <u>see also</u> <u>Bapp v. Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986).  In order to determine whether the claimant could perform other substantial, gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>accord</u> <u>Martinez-Paulino v. Astrue</u>, No. 11 Civ. 5485, 2012 WL 3564140, at *10 (S.D.N.Y. Aug. 20, 2012).

     2.  <u>Judicial Review</u>

Section 205(g) of the Act permits a Social Security claimant to seek judicial review of the Commissioner's final determination denying the claimant's application for disability benefits.  42 U.S.C. § 405(g).  A federal court may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence.  <u>Hahn v. Astrue</u>, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 17, 2009).  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  <u>Longbardi v. Astrue</u>, No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence in this context is "more than a mere scintilla" -- it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks

omitted).   "If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result."  Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).

     B.   The ALJ's Decision

     ALJ Solomon evaluated the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act between September 13, 2011, and July 11, 2012.  (R. at 10-17); 20 C.F.R. § 416.920.  He found that Ms. Laguerre had not engaged in substantial gainful activity since the application date of September 13, 2011, and that she had the following severe impairments: "major depressive disorder, obesity, history of asthma, history of migraines, history of sleep apnea, and history of lumbago."  (R. at 12).  However, the ALJ determined at step three than none of the plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in Part 404, Subpart P, Appendix 1 of the regulations (the "Listings").  (R. at 12-13).

     Specifically, he found that the severity of the plaintiff's mental impairments, singly and in combination, did not meet or medically equal the requirements for an affective disorder in listing 12.04 (R. at 12), which requires that depressive syndrome be accompanied by four of the following characteristics: pervasive loss of interest in almost all activities; appetite disturbance

with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking.  In addition, the depressive syndrome must result in at least two of the following characteristics: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Part 404, Subpt. P, App. 1, Listing 12.04.  The ALJ assumed that the plaintiff met the first prong of the test, but found that she did not meet the second because she had only mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and had not experienced any extended episodes of decompensation.  (R. at 12-13).

At step four, the ALJ determined that Ms. Laguerre had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 416.967(b), but noted that she should avoid "concentrated exposure to respiratory irritants [and] working at unprotected heights and with hazardous material." (R. at 13).  He further found that Ms. Laguerre could remember, understand, and carry out simple instructions, maintain attention and concentration for two-hour segments, maintain a regular schedule with occasional close interpersonal contact, and work in a low stress job without supervisory duties.  (R. at 13).  In

22

reaching this conclusion, the ALJ considered the plaintiff's reported symptoms and found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 14). He noted Ms. Laguerre's bariatric surgery in 2010 and proceeded to outline the findings from Dr. Thukral's November 15, 2011 consultative exam, Dr. Fairweather's December 13, 2011 consultative psychiatric evaluation, Dr. Santana-Rosado's February 27, 2012 psychiatric medical report, and Dr. Harding's January 30, 2012 psychiatric review technique. (R. at 14-15). He gave partial weight to Dr. Fairweather's report "find[ing] mild to moderate to significant difficulty," noting that Dr. Santana-Rosado, her treating psychiatrist, found in February 2012 that the plaintiff's "mental status examination was within normal limits (other than depressed mood), and opined that [she] had no limitations in memory, attention and concentration, sustained concentration and persistence, social interaction and adaptation, and was unable to provide medical opinion on the claimant's ability to work." (R. at 15). He further observed that Dr. Santana-Rosado's records showed "significant improvement once treatment began." (R. at 15). He gave significant weight to these opinions, but nonetheless found that Ms. Laguerre had some limitations. (R. at 15). The ALJ gave partial weight to Dr. Thukral's consultative report finding no

23

exertional limitations other than avoidance of respiratory irritants, but found, based on Ms. Laguerre's history of obesity, migraines, and sleep apnea, that she was limited to light work. (R. at 15).

The ALJ determined that, based on her residual functional capacity, Ms. Laguerre could not perform any of her past relevant work.  (R. at 15). Finally, considering her age, education, work experience, and residual functional capacity, he found that jobs existed in significant numbers in the national economy that Ms. Laguerre could perform.   (R. at 16).   Taking into account limitations that impeded Ms. Laguerre's ability to perform substantially all of the requirements of light work, ALJ Solomon relied on the vocational expert's opinion that she could perform work as a mail room clerk, an office helper, or an assembler of small products. (R. at 16). She was therefore not disabled. (R. at 16-17).

   C.  Substantial Evidence

Substantial evidence supports the ALJ's decision that Ms. Laguerre was not disabled.

At step three, ALJ Solomon determined that Ms. Laguerre's impairments did not meet or equal any impairment in the Listings, focusing on Listing 12.04, for affective disorders.  He found that she had only mild restrictions in activities of daily living, moderate restrictions in social functioning and concentration, persistence, or pace, and no episodes of extended decompensation. (R. at 12-13).  These conclusions are supported by both the medical

24

records and Ms. Laguerre's own testimony.  Treating physician Dr.
Santana-Rosado found that the plaintiff had no limitations in any
area of work-related mental functioning.  (R. at 327).  This is
supported by Dr. Santana-Rosado's treatment notes, which
consistently reflected that the plaintiff's thought processes were
coherent and her attention, concentration, and judgment were
intact.  (R. at 261, 266, 270-71, 282, 284, 327).  Dr. Fairweather,
a consultative examiner, assessed some limitations, finding that
Ms. Laguerre had mild difficulty maintaining attention and
concentration, making appropriate decisions, and relating with
others; mild or moderate difficulty performing complex tasks
independently and maintaining a regular schedule; and moderate to
significant difficulty dealing with stress.  (R. at 262).  The
plaintiff acknowledged that she engaged in extensive activities of
daily living -- taking care of her children, cooking, bathing,
dressing, shopping, and using social media.[5] (R. at 32-35).

To be sure, in the section of his opinion outlining his
findings on step three, the ALJ did not explicitly analyze whether

---

[5] The one piece of evidence that directly contradicts the
ALJ's assessment is the November 7, 2012 treatment note of Dr.
Marcus, which states that Ms. Laguerre was "vocationally
incapacitated" until at least March 2013.  (R. at 341).  However,
this opinion is not properly part of the record, because it post-
dates the ALJ's July 11, 2012 decision.  20 C.F.R. § 416.1470(b)
("[T]he Appeals Council shall consider [] additional evidence only
where it relates to the period on or before the date of the
administrative law judge hearing decision."); Perez v. Chater, 77
F.3d 41, 45-46 (2d Cir. 1996) (holding that evidence submitted to
Appeals Council becomes part of record to extent that Appeals
Council evaluates it as part of administrative record and it
relates to period on or before ALJ's decision).

a combination of exertional and non-exertional impairments met or equaled a listed impairment. (R. at 12-13). However, he noted that "[t]he bases for [his] conclusions [were] set forth in greater detail in  paragraph 4," the section in which he examined Ms. Laguerre's records, including records regarding her depressive disorder, migraines, and exertional limitations. (R. at 13-15). Because it is clear that the ALJ considered all of the plaintiff's impairments through examination of the medical records, his "step three . . . analysis sufficiently assessed the plaintiff's combination of impairments." Seekins v. Astrue, No. 3:11CV264, 2012 WL 4471266, at *7 (D. Conn. Aug. 14, 2012) (internal quotation marks omitted).

At step four, the ALJ determined that Ms. Laguerre could perform a range of light work. This conclusion, too, was supported by substantial evidence. In connection with his analysis of her exertional limitations, the ALJ gave some weight to the opinion of Dr. Thukral, a consultative examiner, who determined that the plaintiff's only physical limitation required avoidance of respiratory irritants. (R. at 259). The records of her treating physicians do not support a finding that Ms. Laguerre had exertional limitations that would preclude her from engaging in light work. In November 2011, Dr. Osvath found that the plaintiff was functioning within normal limits. (R. at 244). Ms. Laguerre reported to Dr. Alfonso in December 2011 that medication had improved her asthma symptoms, and that her last attack had been one month before. (R. at 295). Although she visited the pulmonary

26

clinic in January 2012 complaining of increased tightness in her chest (R. at 290-91), the condition apparently improved with prednisone, as the medical records do not indicate further issues. Although Dr. Kleiman opined in February 2012 that Ms. Laguerre's migraines impaired her ability to function (R. at 321), this opinion is undermined by other evidence showing that her migraines responded to medication so that severe migraines occurred less frequently over time. (R. at 38-39, 241-42, 248).

Similarly, the ALJ's assessment of Ms. Laguerre's non-exertional limitations is not erroneous. As noted above, the ALJ examined the records of her treating and consultative examiners and assessed only moderate limitations, at most. The ALJ included these limitations in his assessment of Ms. Laguerre's residual functional capacity. (R. at 15). Indeed, his determination was more generous than that of her treating physician, who found that she had no limitations in work-related mental functioning. (R. at 327). The ALJ's conclusion is buttressed by the plaintiff's testimony and other evidence in the record that she was fully capable in engaging in activities of daily living. (R. at 33-35, 138-39, 146). Finally, the ALJ's ultimate finding that Ms. Laguerre was not disabled because there were jobs existing in significant numbers in the national economy that she could perform is supported by substantial evidence. Here, ALJ Solomon relied on the testimony of the vocational expert in response to his hypothetical. (R. at 16, 44-47). This hypothetical accurately reflected the ALJ's residual functional capacity assessment. (R.

at 44). Therefore, the ALJ properly concluded that Ms. Laguerre was not disabled and was not entitled to SSI benefits.

Conclusion

For these reasons, the defendant's motion for judgment on the pleadings (Docket no. 23) is granted. The Clerk of Court is respectfully directed to enter judgment dismissing the complaint and to close this action.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       December 29, 2014

Copies mailed this date:

Maria Del Carmen Laguerre
435 E. 105th St.
Apt. 914
New York, NY 10029

Elizabeth Rothstein, Esq.
Special Assistant U.S. Attorney
c/o Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278